THE NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY *v.*
RAILROAD AND PUBLIC UTILITIES COMMISSION, *et al.*

(*Nashville.*  December Term, 1928.)

Opinion filed April 13, 1929.

Fitzgerald Hall, Seth M. Walker, Walton Whitwell and Frank Slemons, for complainant.

Roy H. Beeler and L. D. Smith, Attorney-General, for defendant.

Mr. Justice Cook delivered the opinion of the Court.

Complainant, suing under chapter 29, Acts of 1923, seeks a declaratory judgment (1) as to the constitutionality of chapter 10, Acts of 1897; chapter 390, Acts of 1907, that confer certain powers upon the Commission; and (2) if the Acts are valid, as to the authority of the Commission to determine the character of the employees through which complainant, as a common carrier, shall render service at its several offices, stations and depots.

The controversy relates to section 2, chapter 390, Acts of 1907, and rules promulgated by the Commission under the statute. The defendant demurred to the bill, insist-

ing; through its several grounds of demurrer (1) that complainant was estopped from challenging either the constitutionality of the Acts or the rules made under them, by its recognition of their validity, and its submission to the jurisdiction of the Commission, in numerous proceedings before the Commission in which the complainant treated both the statute and the rules under it as valid; (2) that the Acts are valid and the challenged rules reasonable and not in excess of the powers conferred by the statute.

The chancellor pretermitted the constitutional questions raised by the bill as immaterial to the rights of either party, and we think properly so, for the courts will not pass upon the constitutionality of a statute when not required for a decision of the case. *Richardson* v. *Young*, 122 Tenn., 471; *Van Dyke* v. *Thompson*, 136 Tenn., 36.

The chancellor overruled the first, fourth and fifth grounds of demurrer, sustained the bill and held that complainant was not estopped from challenging the reasonableness of the rules, and declared that insofar as the rules transcended express provisions of the statute, they are invalid.

The defendant appealed, insisting that the chancellor erroneously applied the doctrine of strict construction in interpreting the rules, and that he erred in holding them to be broader than the empowering statutes, especially in view of the amendatory Act of 1919, chapter 49, section 12, which declares that the Act shall be liberally construed and that any doubt as to the existence or non-existence of a power conferred by the original and amendatory Act shall be resolved in favor of the existence of the power, to the end that the Commission may

effectively govern and control the public utilities placed under its jurisdiction. The object of construction of a statute, whether by resort to strict or liberal construction, is to discover the legislative intent, and when the intent is ascertained, the courts cannot, by resort to a so-called liberal construction, give to an Act a meaning beyond its terms.

The only provisions of the original or amendatory Act, pertinent to this inquiry, is section 2, chapter 390, Acts of 1907, which provides:

"Authority is hereby vested in the Railroad Commission of Tennessee, and it is hereby made its duty, to supervise and fix the rates, charges, and regulations of railroad freight and passengers tariffs; to correct abuses and to prevent unjust discrimination and extortions in the rates for freight and passenger tariffs on the different railroads in this State, and to require the location of such depots and the establishment of such freight and passenger buildings as the conditions of the roads, safety of freight, and public comfort may require.

"The Commission shall have power to make all needed rules for its government and for its proceedings, and to regulate the mode and manner of all investigations and hearings of railroad companies and other parties before it, and to adopt and enforce such rules and regulations and modes of procedure as it may deem proper for the hearing and the determination of all complaints made by any railroad company or other parties."

Exercising the powers conferred by this section, the Commission promulgated Rule 2 as follows:

"Each and every depot, station, office and agency, now maintained, conducted or used, in Tennessee by any railroad doing business in this State, for the transaction of

business with the public, is hereby formally established and located at the point and on the premises where the same is now being so maintained and conducted. No such depot, station, office or agency as aforesaid, now established or which may hereafter be established pursuant to orders made by the Commission or voluntarily by such company, or otherwise established, shall be closed, removed, suspended, discontinued or abolished without authority granted by the Commission upon written application.''

The controversy between the Railway and the Commission arose out of the desire of the Railway to change the character of its employees, through which service should be rendered at stations maintained under the circumstances stated in the bill as follows:

''Since the advent of good roads and the general use of automobiles, buses and trucks the short-haul freight and passenger business of your complainant has diminished at a continuous and alarming rate so that it has become necessary for the management of the Nashville, Chattanooga & St. Louis Railway to materially modify and curtail in various ways the services which it has heretofore rendered the public in Tennessee and elsewhere, which services the public no longer uses to any appreciable extent.

''Studies and investigation developed the fact that your complainant was maintaining high salaried agents at many points where there was not enough business to justify the keeping of a regular agent on duty all day. In many such cases the salary of the agent exceeded the total gross revenues received from all freight and passenger business at that station. Generally such agents'

duties required their attention only for an hour or an hour and a half during the day.

"As a result of agreements and proceedings initiated by the Federal government during Federal control of railroads there is a fixed schedule of wages for all station agents regardless of their duties and their hours of service. If an employee is maintained at a small station acting in the technical capacity of an agent, then his salary is fixed beyond the control of your complainant, regardless of the amount of work performed by such agent or the value of his services. In other words, wherever agents, using that term in its technical meaning, are maintained, their salaries are beyond the control of the management of your complainant.

"To meet this condition and in order to operate efficiently and economically as required by law, particularly the Act of Congress known as the Transportation Act of 1920, your complainant concluded to do away with technical agents at many small places along its lines in Tennessee and elsewhere and to substitute therefor other employees to be known as caretakers. Such a caretaker will be on duty whenever there is any public need, will see to it that the station building is open for the public at all appropriate hours, that fires are made when the weather so demands, and that the station building is kept clean and in good order. However, such caretaker will not have to be on duty a full eight hours but only during the time he is actually needed. Under this arrangement there will be no modification in train service and no change in the physical facilities offered the public. Passengers will buy their tickets or pay their fares on trains without additional cost instead of from an agent. Trains will operate without change on this account."

"Freight will be handled as heretofore except that the caretaker will not collect charges or issue bills of lading. He will put the less than carload freight in the freight house and see that it is protected. The method in detail of handling the public business at such a station where a caretaker is substituted for an agent is attached hereto, marked Exhibit .1, and made a part hereof, but not for copy. This procedure will enable your complainant to save nearly $100 a month at each of some 40 or 50 little stations without affecting in any substantial degree the service rendered the public. Its employee will simply be designated as a caretaker instead of an agent. There is no plan to abolish, abandon or close the physical facilities or to curtail the use of such physical facilities. The title of the employee at such stations will merely be changed and his hours of service and compensation will be determined by the work he does, which in turn depends directly on public requirements, and not by an arbitrary uniform union scale."

Referring to the Acts, and especially section 2 of the Acts of 1907, it seems clear that the power of the Commission is confined to the regulation of freight and passenger tariffs and to the location of depots and freight and passenger buildings necessary for the safety of freights and the convenience and comfort of passengers. That construction was given the Act in *C., N. O. & T. P. R. Co.* v. *State,* 148 Tenn., 128.

In administering the law, the Commission is authorized to make and enforce rules consonant with the powers conferred by the Act, either expressly or by implication. The Act confers on the Commission the power to require the location of such depots and the establishment of such freight and passenger buildings as the condition of the

roads, safety of freight and public comfort may require. This implies the power to forbid the abandonment of an existing depot or station required for public convenience, the safety of freight and the convenience and comfort of passengers. But the implication does not follow that the Commission may direct and control the Railway in the selection of its employees at such depots and stations or fix their hours of duty.

If given such a construction, Rule 2 would be void as exceeding the powers conferred by the Act.

We think assignments of error on the action of the chancellor in refusing to apply the doctrine of estoppel, under the circumstances presented by the bill, contain no merit.

Let a declaration be entered here in conformity with this opinion, with the result that the decree of the chancellor in sustaining the bill is affirmed.