# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 9, 2004 Session

## OFFICE OF THE ATTORNEY GENERAL, CONSUMER ADVOCATE AND PROTECTION DIVISION v. TENNESSEE REGULATORY AUTHORITY

**Appeal from the Tennessee Regulatory Authority**
**No. 03-00060**

**No. M2003-01363-COA-R12-CV- Filed November 29, 2005**

This appeal involves the Tennessee Regulatory Authority's consideration of a tariff filed by BellSouth Telecommunications, Inc. A group of competing telecommunications providers and the Consumer Advocate and Protection Division of the Office of the Attorney General filed petitions to suspend the proposed tariff and to open a contested case proceeding because the tariff was discriminatory and anti-competitive. The Authority considered the proposed tariff and the requests for a contested case proceeding at three conferences. After BellSouth amended the tariff to meet several of the objections of its competitors and the Consumer Advocate and Protection Division, the Authority, by divided vote, declined to suspend the tariff or to convene a contested case proceeding and permitted the revised tariff to take effect. On this appeal, the Consumer Advocate Division and the competing telecommunications providers assert that the Authority erred by refusing to open a contested case proceeding regarding their objections to the revised tariff. They also insist that the Authority's approval of the tariff is not supported by substantial and material evidence. We have determined that the Authority abused its discretion by refusing to open a contested case proceeding to resolve the contested issues regarding whether the revised tariff was discriminatory and anti-competitive.

**Tenn. R. App. P. 12 Petition for Review; Judgment of the Tennessee Regulatory Authority Vacated and Remanded**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Joe Shirley, Assistant Attorney General, for the appellant, Office of the Attorney General, Consumer Advocate and Protection Division.

Henry Walker, Nashville, Tennessee; and Martha M. Ross-Bain, Atlanta, Georgia, for AT&T Communications of the South Central States, LLC and *amicus curiae* Competitive Carriers of the South, Inc.

J. Richard Collier, Jean A. Stone, and Randal Gilliam, Nashville, Tennessee, for the appellee, Tennessee Regulatory Authority.

R. Dale Grimes, Brian Roark, Guy M. Hicks, and Joelle Phillips, Nashville, Tennessee, for the appellee, BellSouth Telecommunications, Inc.

**OPINION**

**I.**

On January 3, 2003, BellSouth Telecommunications, Inc. (BellSouth) filed a tariff with the Tennessee Regulatory Authority (Authority) to introduce its "Welcoming Reward Program." The purpose of this program was to encourage certain businesses[1] who were not existing BellSouth customers to obtain their basic local business service from BellSouth. The tariff, as originally filed, offered qualifying businesses a $100 per line/per location bonus in return for the business's agreement to enter into a twelve-month service contract. The tariff also authorized BellSouth to impose a charge on customers who terminated their contract before its expiration. BellSouth envisioned that this program would last from February 3, 2003 through May 2, 2003.

Approximately three weeks later, a coalition of four competing telecommunications providers[2] filed a petition requesting the Authority to suspend the "Welcoming Reward Program" tariff and to open a contested case proceeding. BellSouth's competitors objected to the "Welcoming Reward Program" because (1) it discriminated between BellSouth's new and existing business customers, (2) it required customers to enter into long-term service contracts, and (3) it did not clearly define the conditions on their ability to resell the program. On January 31, 2003, BellSouth filed a lengthy written response to the competitors' objections. On the same day, the Consumer Advocate and Protection Division of the Office of the Attorney General (CAPD) petitioned to intervene. In addition to the issues raised by BellSouth's competitors, the CAPD asserted that the tariff "could" (1) create a "price squeeze"[3] and (2) inappropriately inflate consumer acquisition costs.

The Authority first addressed the competitors' petitions to suspend BellSouth's "Welcoming Reward Program" tariff at its February 3, 2003 conference. Procedural ambiguity reigned. The

---

[1]To qualify for this program, a business must be located in the Chattanooga, Knoxville, Memphis, or Nashville metropolitan calling regions and must not have an aggregate annual billing exceeding $36,000 at the time of enrollment.

[2]The coalition included Access Integrated Networks, Inc., Cinergy Communications Company, Xspedius Communications, and AT&T Communications of the South Central States, Inc. All these companies are members of Competitive Carriers of the South, Inc. (CompSouth), a coalition of competing local exchange companies.

[3]A traditional "price squeeze" involves a defendant who, as a monopolist, supplies the plaintiff at one level (e.g., wholesale), competes with the plaintiff at another level (e.g., retail), and seeks to destroy the plaintiff by holding up the wholesale price to the plaintiff while depressing the retail price to their common customers. *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 418 (1st Cir. 2000). In more common parlance, a "price squeeze" refers to a circumstance in which the combination of high wholesale prices and low retail prices makes it difficult for a wholesale customer to compete with its supplier at the retail level.

Authority permitted all parties to make oral presentations explaining their respective positions. BellSouth insisted that the issues being raised by the CAPD and its competitors were "wrong as a matter of law" and that these "bare allegations shouldn't be enough to derail and delay this tariff." For their part, the CAPD and BellSouth's competitors insisted that the "Welcoming Reward Program" was discriminatory on its face, that it violated the Authority's resale requirements, and that it was not a promotional tariff because it required customers to enter into a long-term service agreement.

Following a lengthy colloquy between the directors and the parties, Director Ron Jones asked whether the Authority had sufficient facts to address the issues being raised or whether there was "some question of fact that would warrant going to a [contested case] proceeding at this point as opposed to taking all the comments under advisement . . . ." The answers of both the CAPD and BellSouth's competitors were equivocal.[4] Thereafter, BellSouth, "[i]n the spirit of compromise and conciliation," recommended that the Authority allow its "Welcoming Reward Program" to go into effect while it took the issues raised by the CAPD and the competitors under advisement. The Authority decided to move this issue to the end of its agenda after Director Jones and Chairman Sara Kyle split over whether to accept BellSouth's offer.

When the Authority returned to the "Welcoming Reward Program," its staff and the parties stated that they had been discussing a compromise of sorts. The compromise involved the immediate approval of a temporarily modified version of the tariff[5] that would remain in effect while the Authority addressed the concerns about the original tariff. There was, however, significant ambiguity regarding the details of the revised tariff and the procedure that the Authority would use to address the issues regarding the original tariff.[6] The lawyers representing the CAPD and BellSouth's competitors also informed the Authority that they lacked the authority to accept the compromise at that time.

The Authority and the parties then turned their attention to the procedural posture of the current proceeding. After a lengthy discussion among the directors, their staff, and the lawyers representing BellSouth's competitors and the CAPD, Chairman Kyle stated that the Authority was

---

[4]The lawyer representing the CAPD had already observed: "I think that there could be, especially with regard to some of the issues, for example, with respect to whether there's a price squeeze or not. . . . There could be other areas, but that's one that leaps to my mind." The lawyer representing BellSouth's competitors admitted that the Directors could go back to their offices and make the calculations regarding the price squeeze claim and that the issue regarding differentiating between new and existing customers was a "question of law and policy." However, he added "I would think you would want a little more research on the legal and policy implications of what it would mean to start treating new customers different than existing customers and how that might affect other dockets."

[5]To avoid the suspension of its original tariff, BellSouth had apparently offered to reduce the length of the service contract its customers would be required to sign from twelve to three months. Its competitors were skeptical about "the idea of giving away essentially three months [of] free service."

[6]The Authority's staff stated that the proposal envisioned that a contested case proceeding would be opened with regard to BellSouth's original "Welcoming Reward Program" tariff in which the Directors would be given an opportunity to address the issues raised by the CAPD and BellSouth's competitors.

still trying to determine whether to open a contested case proceeding with regard to the complaints regarding BellSouth's original "Welcoming Reward Program." She also stated that she believed that the Authority "need[ed] time to analyze and decide if a contested case is warranted." Accordingly, she moved that the proposed compromise plan be permitted to go into effect and that "this matter be placed back on the docket for February 18th in order to decide whether a contested case is warranted." Director Deborah Taylor Tate concurred with Chairman Kyle; however, Director Jones did not. An order embodying the Authority's decision at its February 3, 2003 conference was entered on February 14, 2003.

On February 4, 2003, the day following the hearing, BellSouth filed a revised "Welcoming Reward Program" tariff reflecting its understanding of the temporary modifications that the Authority had agreed to on February 3, 2003. Unfortunately, BellSouth's understanding of the agreed-upon modifications did not jibe with the Authority's.[7] On February 11, 2003, both the CAPD and BellSouth's competitors filed briefs discussing their objections to BellSouth's original "Welcoming Reward Program" and again requesting the Authority to open a contested case proceeding to consider the "serious legal and regulatory issues" regarding BellSouth's original and revised tariff. In its February 14, 2003 response to these briefs, BellSouth asserted that the CAPD and its competitors had "demonstrated no basis to convene a contested case" and that the Authority should "exercise its discretion and decline to convene a contested case in this matter."

The Authority revisited BellSouth's "Welcoming Reward Program" at its February 18, 2003 conference. Neither the directors nor the parties spent much time discussing the need to convene a contested case hearing. Instead, they first addressed the discrepancy between BellSouth's revised tariff filed on February 4, 2003 and the Authority's February 14, 2003 order. Then the parties restated their positions regarding the original "Welcoming Reward Program" at some length. The discussions focused chiefly on the "resale" aspects of the original tariff and the requirement that customers sign a long-term contract. During this discussion, it was evident that both Chairman Kyle and Director Tate were urging BellSouth to make additional concessions to satisfy the objections of the CAPD and its competitors.[8]

Eventually, BellSouth offered to file yet another revised tariff to address the issues regarding whether the "Welcoming Reward Program" was a short-term or long-term promotion and whether the promotional discount offered in the tariff would be available for resale. Director Tate insisted that the revisions be filed immediately. On February 20, 2003, Chairman Kyle directed BellSouth

---

[7]BellSouth's modified tariff filed on February 4, 2003 required subscribers to sign a twelve-month contract but permitted them to cancel the contract within ninety days of its execution with no termination liability. However, the Authority's February 14, 2003 order reflected a far different understanding of the proposed modification discussed at the February 3, 2003 conference. It recited that the majority of the directors voted "[t]o accept a revision to the *Tariff* such that subscribing customers could terminate their agreement with BellSouth under the *Tariff* after ninety (90) days without termination liability . . . ."

[8]At one point, Director Tate pointedly told BellSouth, "if you aren't willing to modify the tariff, you know, then you maybe put me in a position for a motion for reconsideration and to vote a different direction, and that I think that we have precedent . . . to stop the effective date of a tariff and/or to suspend the tariff and move for a contested case. You know, I don't know what other options there may be."

to submit its revised tariff by February 21, 2003 and directed CAPD and BellSouth's competitors to file their responses by February 25, 2003. Director Jones objected to permitting BellSouth's modified "Welcoming Reward Program" to go into effect without first deciding whether to open a contested case proceeding.

On February 21, 2003, BellSouth filed a revised "Welcoming Reward Program" tariff containing significant alterations intended to meet the objections raised by the CAPD and its competitors. BellSouth extended the duration of the program to make it a long-term promotion. It required customers to maintain the contract through the fourth subsequent billing period and provided that they would receive the $100 per line credit during the fourth or fifth subsequent billing period. Finally, the revised tariff provided that both the underlying service and the bill credit would be made available to resellers at the Authority's required wholesale discount.

The response of the CAPD and BellSouth's competitors was tepid. The CAPD continued to argue that most of the issues it had raised in the earlier proceedings had not been resolved and requested the Commission to convene a contested case proceeding to evaluate these issues. BellSouth's competitors asserted that the revised tariff did not address BellSouth's discrimination between new and existing customers and argued that "BellSouth is using its market and financial power in a concerted effort, not to make money, but to put its competitors out of business." The competitors also requested a contested case hearing.[9] In its February 28, 2003 response to these comments, BellSouth reiterated its opposition to convening a contested case hearing and insisted that the resale provisions in its revised tariff were precisely what its competitors had requested during the February 18, 2003 conference.

BellSouth's revised "Welcoming Reward Program" was back before the Authority on March 3, 2003. While BellSouth's competitors characterized the revised tariff as a "substantial improvement" over the original tariff, both the competitors and the CAPD insisted that the revised tariff did not address the issue of discriminating between new and existing customers[10] or the unreasonable limitations of the resale of the promotion and that it did not resolve the potential of a price squeeze. The CAPD also questioned the continuing requirement of long-term service contracts with termination penalties. Following a lengthy discussion, the dispute narrowed to (1) the CAPD's request that BellSouth revise the tariff to make it clear that resellers could sell the program to all new business customers, not just to new customers who had been BellSouth customers, and (2) the competitors' request that they be permitted to resell the program not only to their new customers but also to their existing customers. While BellSouth agreed to the revision suggested by the CAPD, it declined to agree to modify the tariff to permit resellers to offer the program to existing customers.

---

[9]The attorney representing the competitors noted that "[s]urely, the fifty-plus pages of filings that have already been made in this case and the hours of oral argument at the last two TRA conferences are sufficient to demonstrate, if nothing else, that these are serious matters which the agency is obliged to consider."

[10]While the original concern had been BellSouth's discrimination between its new and existing customers, its competitors now insisted that they should be permitted to resell the promotion to their own customers as well as to new customers.

Noting that the parties "had ample opportunity to present arguments for and against convening a contested case," Director Tate moved to deny BellSouth's competitors' petition to suspend the "Welcoming Reward Program" tariff and to open a contested case proceeding. She also moved to waive the application of Tenn. Comp. R. & Regs. 1220-4-1-.04 (2003)[11] and allow the revised tariff to go into effect immediately. Chairman Kyle concurred with Director Tate. Director Jones disagreed. In a written dissent filed on April 25, 2003, Director Jones observed that "the majority injudiciously prevented the attachment of . . . [the rights and protections associated with contested cases] while simultaneously deciding the merits of the petitioners' claims . . . ."

## II.

The version of the "Welcoming Reward Program" ultimately approved by the Authority ended by its own terms on May 30, 2003. Because the tariff is no longer in effect, there is no relief this court can provide either to the CAPD or to BellSouth's competitors with regard to this particular program.[12] The fact that we can provide no judicial relief to the CAPD or BellSouth's competitors with regard to the "Welcoming Reward Program" raises a substantial question of mootness which must be addressed at the outset.

The requirements for litigation to continue are essentially the same as the requirements for litigation to begin. *Charter Lakeside Behavioral Health Sys. v. Tennessee Health Facilities Comm'n*, No. M1998-00985-COA-R3-CV, 2001 WL 72342, at *5 (Tenn. Ct. App. Jan. 30, 2001) (No Tenn. R. App. P. 11 application filed). A case must remain justiciable throughout the entire course of the litigation, including any appeal. *State v. Ely*, 48 S.W.3d 710, 716 n.3 (Tenn. 2001); *Cashion v. Robertson*, 955 S.W.2d 60, 62-63 (Tenn. Ct. App. 1997). A case is not justiciable if it does not involve a genuine, existing controversy requiring the adjudication of presently existing rights. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000); *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d 615, 616 (Tenn. Ct. App. 1998).

A moot case is one that has lost its justiciability because it no longer involves a present, ongoing controversy. *McCanless v. Klein*, 182 Tenn. 631, 637, 188 S.W.2d 745, 747 (1945); *County of Shelby v. McWherter*, 936 S.W.2d 923, 931 (Tenn. Ct. App. 1996). A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party. *Knott v. Stewart County*, 185 Tenn. 623, 626, 207 S.W.2d 337, 338-39 (1948); *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d at 616. Determining whether a case is moot is a question of law. *Charter Lakeside Behavioral Health Sys. v. Tennessee Health Facilities Comm'n*, 2001 WL 72342, at *5; *Orlando Residence, Ltd. v. Nashville Lodging Co.*, No. M1999-00943-COA-R3-CV, 1999 WL 1040544, at *3 (Tenn. Ct. App. Nov. 17, 1999) (No Tenn. R. App. P. 11 application filed).

---

[11]Tenn. Comp. R. & Regs. 1220-4-1-.04 requires that tariffs containing changes in rates must be filed with the Authority thirty days before their effective date unless the Authority waives any portion of the time limit for good cause shown.

[12]In fact, the "Welcoming Reward Program" tariff had expired approximately two months before the record on appeal was filed with this court and almost three months before the first appellate brief was filed.

When a case is determined to be moot and when it does not fit into one of the exceptions to the mootness doctrine, an appellate court should ordinarily vacate the judgment below and remand the case to the trial court with directions that it be dismissed. *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d at 617; *McIntyre v. Traughber*, 884 S.W.2d 134, 138 (Tenn. Ct. App. 1994). However, if the case falls into one of the recognized exceptions to the mootness doctrine, the appellate court has the discretion to reach the merits of the appeal in spite of the fact that the case has become moot. *Alliance for Native Am. Indian Rights in Tenn., Inc. v. Nicely*, No. M2002-02555-COA-R3-CV, 2005 WL 1111192, at *3 (Tenn. Ct. App. May 10, 2005) *perm. app. denied* (Tenn. Oct. 17, 2005).

The courts have recognized several exceptions to the mootness doctrine. The three most common exceptions include: issues of great public importance,[13] issues affecting the administration of justice,[14] and issues capable of repetition yet evading review.[15] The courts invoke the "capable of repetition yet evading review" exception only where (1) there is a reasonable expectation that the official act that provoked the litigation will occur again, (2) there is a risk that effective judicial remedies cannot be provided in the event that the official act reoccurs, and (3) the same complaining party will be prejudiced by the official act when it reoccurs. A mere theoretical possibility that an act might reoccur is not sufficient to invoke the exception. Rather, there must be a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party. *Alliance for Native Am. Indian Rights in Tenn., Inc. v. Nicely*, 2005 WL 1111192, at *4 (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S. Ct. 1181, 1184 (1982)).

We have determined that this case fits within the exception to the mootness doctrine for issues that are capable of repetition but which will effectively evade judicial review. First, the comments of two of the directors in this case reflect their, and we presume the Authority's, settled intention to follow this procedure in the future with regard to tariffs filed by telecommunications companies. Second, should the Authority follow this sort of procedure with regard to future objections to relatively short-term tariffs, it is essentially inevitable that this court will be unable to review the Authority's decision until after the tariff has gone into effect and has probably expired. Third, in these circumstances, the interests of the CAPD and the competitors of the telecommunications company filing the tariff could be prejudiced by the procedure the Authority uses to consider their petition to stay the tariff and to conduct a contested case hearing. Accordingly, we have determined that the issues raised by the CAPD and BellSouth's competitors qualify as a matter capable of repetition yet evading review.

---

[13] *E.g., State ex rel. McCormick v. Burson*, 894 S.W.2d 739, 742 (Tenn. Ct. App. 1994); *Dockery v. Dockery*, 559 S.W.2d 952, 955 (Tenn. Ct. App. 1977).

[14] *New Rivieria Arts Theatre v. State*, 219 Tenn. 652, 658, 412 S.W.2d 890, 893 (1967); *McIntyre v. Traughber*, 884 S.W.2d at 137.

[15] *Bemis Pentecostal Church v. State*, 731 S.W.2d 897, 903 (Tenn. 1987); *State ex rel. Dean v. Nelson*, 169 S.W.3d 648, 652 n.4 (Tenn. Ct. App. 2004); *Mayhew v. Wilder*, 46 S.W.3d 760, 778 (Tenn. Ct. App. 2001).

## III.

The central issue in this case involves the Authority's decision to allow BellSouth's revised "Welcoming Reward Program" tariff to go into effect without first opening a contested case proceeding to address the complaints that the tariff was discriminatory and anti-competitive. The CAPD and BellSouth's competitors argue that the Authority abused its discretion by denying their petitions to suspend the tariff and to open a contested case proceeding. BellSouth and the Authority respond that a contested case proceeding was unnecessary and would have only delayed eligible business customers from being able to benefit from the program's lower rates. We have determined that the petitions filed by the CAPD and BellSouth's competitors raised factual and policy issues that should not have been resolved without a contested case proceeding.

## A.

The mid-1990s witnessed a fundamental change at both the federal and state level with regard to the regulation of the telecommunications industry. The impetus for these changes was a desire to promote increased competition, to reduce regulation, and to encourage the rapid development of new telecommunications technologies. Tenn. Code Ann. § 65-4-123 (2004); *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 671 n.21 (Tenn. Ct. App. 1997). Accordingly, in addition to the traditional rate-making procedures, Tennessee's new Tennessee Regulatory Authority was empowered to utilize "alternative forms of regulation for telecommunications services and telecommunications services providers." Tenn. Code Ann. § 65-4-123. The most significant regulatory changes involved the procedures for setting or changing rates for existing or new telecommunications services.

Rate-making is essentially a legislative function that has been entrusted to the Authority. *Southern Bell Tel. & Tel. Co. v. Tenn. Pub. Serv. Comm'n*, 202 Tenn. 465, 486, 304 S.W.2d 640, 649 (1957); *Consumer Advocate Div. v. Bissell*, No. 01A01-9601-BC-00049, 1996 WL 482970, at *4 (Tenn. Ct. App. Aug. 28, 1996) (No Tenn. R. App. P. 11 application filed); *Tenn. Cable Television Ass'n v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992). Beginning in 1995, the process for setting and changing rates for new and existing telecommunications services was modified to provide greater flexibility, less oversight, and more self-determination to the competing telecommunications services providers. The new process envisions that telecommunications services providers will be able to change or add services or change rates without first obtaining the Authority's approval.

The new process permits telecommunications services providers to file tariffs with the Authority defining the new or changed service or charge.[16] These tariffs must be filed well in advance of their proposed effective date to give notice of the provider's intentions to the Authority,

---

[16]Tenn. Code Ann. § 65-5-102(2004) empowers the Authority to require all public utilities to file these tariffs.

the public, and other telecommunications services providers.[17] Unless the Authority suspends the tariff, it becomes effective automatically, and once it becomes effective, the tariff has the force of law and is binding on the provider and its customers. *GBM Commc'ns, Inc. v. United Inter-Mountain Tel. Co.*, 723 S.W.2d 109, 112 (Tenn. Ct. App. 1986).

Merely filing a proposed tariff does not trigger a contested case proceeding. However, any interested person may object to the proposed tariff by filing a timely written complaint stating with some specificity the nature of the person's interest, the grounds for objecting to the proposed tariff, and the relief sought. Tenn. Comp. R. & Regs. 1220-1-2-.02(4) (2000); *see also* Tenn. Comp. R. & Regs. 1220-4-8-.09(a) (2003). The provider that filed the proposed tariff has a right to respond to the complaint. Tenn. Comp. R. & Regs. 1220-1-2-.02(4). Thereafter, the Authority has the discretionary authority to decide whether the complaint raises legal or factual issues that require a contested case proceeding or whether the tariff should be permitted to go into effect. Tenn. Code Ann. § 65-5-103 (2004); Tenn. Comp. R. & Regs. 1220-1-2-.02(4); *Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 763-64 (Tenn. 1998). The Authority may also suspend the proposed tariff pending its decision regarding the need for a contested case proceeding. Tenn. Code Ann. § 65-5-101(c)(3) (Supp. 2005); Tenn. Comp. R. & Regs. 1220-4-1-.06(5) (2003).

No statute or regulation prescribes how the Authority should decide whether to open a contested case proceeding with regard to a proposed tariff. The Authority may "investigate" the complaint to determine whether it has merit. Tenn. Code Ann. § 65-4-117(a)(1) (2004); Tenn. Comp. R. & Regs. 1220-4-8-.09(2)(b) (2003). Thereafter, the Authority may either enter an order dismissing the complaint or petition, Tenn. Comp. R. & Regs. 1220-1-2-.02(5), or it may open a contested case proceeding regarding the proposed tariff. If the Authority decides to open a contested case proceeding, it may also permit the person or persons who filed the complaint or petition challenging the tariff or other interested persons to intervene. Tenn. Code Ann. § 4-5-310 (2005); Tenn. Code Ann. § 65-2-107 (2004); Tenn. Comp. R. & Regs. 1220-1-2-.02(4).

The process used by the Authority to decide whether to open a contested case proceeding to review a proposed tariff is not itself a contested case proceeding. Accordingly, at least at this particular point in the process, the Authority is not required to follow the procedures in either Tenn. Code Ann. §§ 65-2-107 to -119 or Tenn. Code Ann. §§ 4-5-301 to -321 (2005). However, some questions exist regarding the application of these statutes to the judicial review of the Authority's decisions.

The first question involves the court where judicial relief should be sought. Petitions for review are ordinarily filed in the Chancery Court for Davidson County "unless another court is specified by statute." Tenn. Code Ann. § 4-5-322(b)(1)(A). The Uniform Administrative Procedures Act itself provides for judicial review by different courts with regard to the final decisions of five agencies. For four of these agencies, the statute explicitly states that the decisions

---

[17]For example, a tariff that changes an existing tariff must be filed thirty (30) days before its effective date unless the Authority waives all or part of the time. Tenn. Comp. R. & Regs. 1220-4-1-.04.

must arise from contested case proceedings.[18] However, the statute does not explicitly limit judicial review of the Authority's decisions to decisions arising from contested case proceedings. Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii) provides that "[a] person who is aggrieved by *any final decision* of the Tennessee regulatory authority . . . shall file any petition for review with the middle division of the court of appeals." (emphasis added).

We must presume that the General Assembly intentionally omitted the "contested case" limitation with regard to appeals from the Authority's decisions. *Powell v. Blalock Plumbing & Elec. & HVAC, Inc.*, 78 S.W.3d 893, 897 (Tenn. 2002); *State v. Godsey*, 60 S.W.3d 759, 778 (Tenn. 2001). In the absence of the limitation, all appeals from the Authority's final decisions must be filed with this court whether or not they arise from a contested case proceeding. Accordingly, the Authority's decision to decline to stay or to open a contested case proceeding to review a proposed tariff is appealable directly to this court under Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii).

The second question involves the standard of review that should be used in cases of this sort. While the Tennessee Supreme Court determined in *Consumer Advocate Div. v. Greer* that the Authority had discretion to determine whether to convene a contested case proceeding to review a proposed tariff, it did not address how these discretionary decisions should be reviewed. It is not clear whether the court had in mind the common law "abuse of discretion" standard of review[19] or some other standard of review such as Tenn. Code Ann. § 4-5-322(h).

Tenn. Code Ann. § 4-5-322(h) is found in the statutes governing contested case proceedings. Accordingly, it might seem, at least on first reading, that Tenn. Code Ann. § 4-5-322(h) is not applicable in cases of this sort because the Authority did not conduct a contested case proceeding to determine whether it should open a contested case proceeding to review a tariff. However, Tenn. Code Ann. §§ 4-5-301 to -325, while directed primarily toward contested cases proceedings, contains procedural directions applicable to other types of proceedings.

We have already pointed out one example of Tenn. Code Ann. § 4-5-322's application to agency actions that are not contested case proceedings. Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii) requires that appeals from "any final decision" by the Authority must be appealed to this court. The standard of review in Tenn. Code Ann. § 4-5-322(h) is another example. Like Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii), the statutory standard of review in Tenn. Code Ann. § 4-5-322(h) is not

---

[18]These include final decisions by the Department of Human Services, the Department of Children's Services, and the State Board of Equalization. Tenn. Code Ann. § 4-5-322(b)(1)(B)(i) & (iii). Also included are final decisions regarding the provision of special education services. Tenn. Code Ann. § 4-5-322(b) (1) (B)(ii). Proceedings involving special education services are deemed to be contested case proceedings. *Ogden v. Kelly*, 594 S.W.2d 702, 704 (Tenn. 1980).

[19]Under the "abuse of discretion" standard of review, a decision-maker abuses its discretion "when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party." *Doe I ex rel. Doe I v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 2005). We have also pointed out that a decision-maker abuses its discretion when the decision is based on a misapplication of controlling legal principles or a clearly erroneous assessment of the evidence. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

explicitly limited to the review of decisions in contested case proceedings. It simply refers to "the decision of the agency." Accordingly, we have determined, that the proper standard of review for "petitions for review" filed in this court pursuant to Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii) is the one found in Tenn. Code Ann. § 4-5-322(h). Therefore, we will review the Authority's decision to decline to stay or to open a contested case proceeding to review BellSouth's "Welcoming Reward Program" tariff using Tenn. Code Ann. §4-5-322(h).[20]

## B.

It is now well established that the Authority is not required to open a contested case proceeding whenever it receives a complaint or petition challenging a proposed tariff. The Tennessee Supreme Court has determined that the Authority may exercise its discretion to determine whether a contested case hearing is warranted. *Consumer Advocate Div. v. Greer*, 967 S.W.2d at 763. However, the court has yet to address the breadth of the Authority's discretion or the process the Authority may use to exercise its discretion. These questions are before us now.

Prior cases have recognized that the Tennessee General Assembly has given the Authority practically plenary power over the telecommunications services providers subject to its jurisdiction. *Consumer Advocate Div. v. Greer*, 967 S.W.2d at 762; *Tenn. Cable Television Ass'n v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d at 159. However, the Authority's discretion is not without limits. Any regulatory action the Authority takes must be the result of an express grant of authority by statute or must arise by necessary implication from an express grant of authority. *BellSouth Adver. & Publ'g Corp. v. Tenn. Regulatory Auth.*, 79 S.W.3d 506, 512 (Tenn. 2002); *Tenn. Pub. Serv. Comm'n v. Southern Ry.*, 554 S.W.2d 612, 613 (Tenn. 1977). Thus, while the Authority's enabling statutes should be construed in the Authority's favor,[21] they should not be construed so broadly that they permit the Authority to exercise its power in a manner contrary to law. *Pharr v. Nashville C. & St. L. Ry.*, 186 Tenn. 154, 161, 208 S.W.2d 1013, 1016 (1948); *BellSouth Telecoms., Inc. v. Tenn. Regulatory Auth.*, 98 S.W.3d 666, 668 (Tenn. Ct. App. 2002). The Authority must comply with the statutes and constitutional provisions governing its procedures. *Tenn. Cable Television Ass'n v. Tenn. Pub. Serv. Comm'n*, 972 S.W.2d at 680.

No statute or regulation prescribes the factors for the Authority to consider when deciding whether to dismiss a complaint seeking a contested case proceeding regarding a proposed tariff. In two cases where the courts have reviewed the Authority's denial of a contested case proceeding, the grounds for the Authority's decision resembled grounds similar to those usually raised in a Tenn. R. Civ. P. 12.02 or Tenn. R. Civ. P. 12.03 motion. In one case, the Tennessee Supreme Court upheld

---

[20]We also note that five specific review criteria in Tenn. Code Ann. § 4-5-322(h) are essentially specific manifestations of the sort of decision-making that would be considered an "abuse of discretion." Acting in violation of constitutional or statutory provisions [Tenn. Code Ann. § 4-5-322(h)(1)] would clearly constitute an "abuse of discretion," as would acting in excess of the decision-maker's statutory authority [Tenn. Code Ann. § 4-5-322(h)(2)], using an unlawful procedure [Tenn. Code Ann. § 4-5-322(h)(3)], or making a decision that is unsupported by the evidence [Tenn. Code Ann. § 4-5-322(h)(5)].

[21]Tenn. Code Ann. §§ 65-2-121, 65-4-106 (2004).

-11-

the dismissal of a "vague and nonspecific complaint" that failed to state a claim in accordance with the Authority's pleading rules. *Consumer Advocate Div. v. Greer*, 967 S.W.2d at 763. In the second case, this court upheld the dismissal of a complaint raising issues that the Authority had already addressed. *Consumer Advocate Div. v. Tenn. Regulatory Auth.*, No. M1999-01170-COA-R12-CV, 2001 WL 575570, at *6 (Tenn. Ct. App. May 30, 2001) (No Tenn. R. App. P. 11 application filed). In both of these cases, the Authority was not required to resolve any disputed factual issues regarding the nature or effect of the challenged tariff, nor was it required to resolve new legal or policy questions. The complaints were subject to dismissal as a matter of law.

This case presents an entirely different circumstance. Here, both the CAPD and BellSouth's competitors filed complaints that satisfied the Authority's specificity requirements.[22] The issues raised in the complaints when they were first filed,[23] particularly the issue regarding the discrimination between new and existing customers, had not been previously addressed by the Authority.

In this proceeding, the Authority went beyond simply determining whether the petitions filed by the CAPD and BellSouth's competitors raised meritorious issues regarding the proposed "Welcoming Reward Program" tariff. Two of the three directors considering the petitions, implicitly recognizing the validity of the petitioners' concerns, used the prospect of a contested case proceeding to induce BellSouth to revise the tariff to address the issues raised in the petitions. The ploy was partially successful. Three "negotiating" sessions with the Authority produced several revisions to the tariff that addressed three of the six issues raised by the CAPD and BellSouth's competitors. The three remaining issues involved: (1) the price discrimination between BellSouth's new and existing customers, (2) the restriction on the resellers' ability to offer the promotion to their existing customers, and (3) the requirement that customers enter into a one-year service contract. The CAPD and BellSouth's competitors continued to insist that these features of the proposed tariff were discriminatory and anti-competitive.

The two-director majority addressed these issues head on in their April 14, 2003 order by treating them as questions of law rather than as questions of fact. With no evidence in the record to support their conclusions, they concluded that the tariff's differentiation between new and existing customers was not discriminatory.[24] They based this conclusion on the representations of BellSouth's lawyers that new customers and existing customers were not similarly situated because

---

[22]Neither the Authority nor BellSouth claimed that the petitions challenging the "Welcoming Reward Program" tariff were so vague and ambiguous that a more definite statement was required. Tenn. Comp. R. & Regs. 1220-1-2-.03(4). Similarly, they did not assert that the petitions did not allege with sufficient specificity the grounds for seeking relief, the nature of the relief sought, and the Authority's jurisdiction to grant the requested relief.

[23]After BellSouth revised the "Welcoming Reward Program" tariff to make it a long-term promotion, the Authority determined that it had previously approved one-year service contracts for similar long-term promotions.

[24]While utilities must offer the same rates to "all persons alike under the same conditions and circumstances" they need not offer the same rates to persons who are dissimilar, "and any fact that produces an inequality of condition and a change of circumstances justifies an inequality of charge." *Southern Ry. Co. v. Pentecost*, 205 Tenn. 716, 725, 330 S.W.2d 321, 325 (1959).

of self-evident differences in "marketing costs" and "business opportunities." However, the record contained no evidence regarding the difference between the marketing costs incurred to attract new business customers and the marketing costs incurred to retain existing customers or the difference between the business opportunities with regard to new customers and the business opportunities with regard to retaining and expanding the services provided to existing customers. As far as the present record shows, the distinctions between new and existing customers relied upon by the Authority and BellSouth could very well be a distinction without a difference.

The two-director majority did not address the fact that new customers who sign a service contract as a result of the "Welcoming Reward Program" become existing customers. Thus, following enrollment, the new customer-existing customer distinction disappears because all customers are existing customers. Both the CAPD and BellSouth's competitors pointed out that these "new" existing customers would be paying less for their telephone service than customers who contracted for the same service either before or after the promotion. They also assert that if the *Southern Ry. v. Pentecost* standard is applied to customers after they have contracted for service, the proposed tariff results in price discrimination between customers who are receiving the same service.

Likewise, the two-director majority failed to address the complaints that the final version of the proposed "Welcoming Reward Program" tariff is anti-competitive because it prevents resellers from offering the program to their existing customers. BellSouth's competitors argued that BellSouth was using its market power to undermine its competitors by offering discounted rates while preventing its competitors from purchasing the same discounted service and offering it to their existing customers.[25] BellSouth's response was simply that its tariff placed the same restrictions on its competitors when they resold the program that BellSouth was placing on itself. Notwithstanding BellSouth's concession that the cost of providing the program to a reseller's new and existing customers would be the same, the Authority neglected to make specific findings regarding whether the restriction was anti-competitive.

Discretionary decisions must take the law and the facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996); *DeLapp v. Pratt*, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004). It was evident at the March 3, 2003 conference that the parties continued to disagree about whether the proposed "Welcoming Reward Program" tariff was discriminatory and anti-competitive and that the record contained no evidence upon which the Authority could resolve this dispute. Accordingly, we have determined that the Authority abused its discretion by dismissing the petitions to suspend the "Welcoming Reward Program" tariff and to convene a contested case proceeding without properly addressing factual issues raised by the complaints. The CAPD and BellSouth's competitors raised valid issues regarding the revised tariff's rate discrimination and potentially anti-competitive effects

---

[25]The lawyer representing BellSouth's competitors asserted: "Well, I should be able to buy the offer myself and resell it to my own customer, and, ironically, that's the only situation in which BellSouth doesn't want that customer. They will want him if they can serve him directly, but they don't want him if they have to serve him through a reseller."

that warranted giving them an opportunity to make their case in the context of a contested case proceeding.[26]

**IV.**

As a final matter, both the Authority and BellSouth argue that the CAPD and the competing telecommunications services providers waived their right to challenge the procedure the Authority used to determine whether to convene a contested case proceeding. They insist that both the CAPD and the competing telecommunications services providers conceded during the March 3, 2003 conference that no further evidence was necessary to enable the Authority to act on the merits of their petitions challenging the "Welcoming Reward Program" tariff. We have determined that the Authority and BellSouth have misconstrued the remarks of the CAPD and BellSouth's competitors.

This proceeding amounted to a novel form of regulatory alternative dispute resolution. Two of the directors viewed it as a means to enable the parties to narrow or resolve their disagreements regarding BellSouth's "Welcoming Reward Program" tariff.[27] Such a proceeding is consistent with the broad and flexible grant of power to the Authority to regulate telecommunications services providers,[28] and parties to proceedings before the Authority, like BellSouth, the CAPD, and BellSouth's competitors, may agree to participate in such proceedings in lieu of a contested case proceeding. *See Team Design v. Gottlieb*, 104 S.W.3d 512, 517 (Tenn. Ct. App. 2002) (pointing out that parties are free to settle their disagreements using virtually any mutually satisfactory procedure that is neither illegal nor contrary to public policy).

Neither the CAPD nor BellSouth's competitors abandoned their request for a contested case hearing on their challenges to BellSouth's "Welcoming Reward Program" tariff. In every document they filed and in each of the three conferences during which the Authority considered the tariff, they requested an opportunity to discover and present evidence supporting their assertions that the tariff was discriminatory and anti-competitive. At the conclusion of the final conference on March 3, 2003, Director Jones asked the lawyers representing the CAPD and BellSouth's competitors, "[w]hat more is there to add to this dialogue?" Both responded that they had nothing further to add.[29]

---

[26]The Authority did not err by declining to open a contested case proceeding with regard to the claim that the tariff's requirement that customers enter a long-term service contract was unfair because the Authority had already approved this feature in other long-term promotions.

[27]One director commented at the close of the March 3, 2003 hearing that "I am . . . for us coming to consensus rather than a lengthy, costly, and almost always time-consuming contested case hearing. Most of these issues aren't going to be resolved in a single hearing. We're in a continuum here . . . [and] I'm hopeful that we will continue toward consensus building . . . ."

[28]Tenn. Code Ann. § 65-4-123.

[29]One lawyer responded, "[t]hree briefs is enough for me." The other lawyer stated: "I would not want to, I guess, compromise our ability to do discovery in this case if a case . . . is eventually convened. With respect to the issue
(continued...)

-14-

The Authority and BellSouth would have us construe the lawyers' comments as signifying that the CAPD and BellSouth's competitors not only acquiesced in the decision-making process but also conceded that they had no further evidence to present with regard to their challenges to the "Welcoming Reward Program" tariff. However, when taken in context, the lawyers' answers to Director Jones's question signified only that they had nothing more to offer with regard to the question of whether the Authority should open a contested case proceeding. Waivers of procedural rights should be not presumed from equivocal conduct or ambiguous statements. In the context of this particular proceeding, it would be unfair and inappropriate to conclude that the CAPD and BellSouth's competitors abandoned their requests for the contested case proceeding that they had been pursuing for over two months. Accordingly, we decline to find that either the CAPD or BellSouth's competitors waived their right to challenge the legal propriety of the Authority's decision-making process or its decision to deny their petitions to suspend the proposed "Welcoming Reward Program" tariff and to open a contested case proceeding regarding their complaint that the tariff was discriminatory and anti-competitive.

## V.

In summary, we have concluded that the Authority abused its discretion when it declined to grant a contested case hearing regarding the challenges that BellSouth's "Welcoming Reward Program" tariff was discriminatory and anti-competitive. Therefore, the Authority's April 14, 2003 order dismissing the petitions to suspend the tariff and to open a contested case proceeding must be vacated in accordance with Tenn. Code Ann. § 4-5-322(h)(4), and the case must be remanded to the Authority for further proceedings consistent with this opinion. We tax the costs of this appeal to the Tennessee Regulatory Authority.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[29](...continued)
of whether or not a case should be . . . convened . . . we have probably gone beyond the pale on that particular issue."